# United States Court of Appeals
## For the First Circuit

No. 01-1904

UNITED STATES OF AMERICA,

Appellee,

v.

FRANKLIN DIAZ,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. Ernest C. Torres, U.S. District Judge]

Before

Boudin, Chief Judge,
Bownes, Senior Circuit Judge,
and Lipez, Circuit Judge.

Thomas M. Dickinson, with whom Pine & Cantor was on brief for appellant.

Donald C. Lockhart, Assistant United States Attorney, with whom Margaret E. Curran, United States Attorney, and Stephanie S. Browne, Assistant United States Attorney, were on brief for appellee.

August 20, 2002

**LIPEZ, Circuit Judge**.  On February 1, 1999, there was a fire at a restaurant owned by defendant-appellant Franklin Diaz. Thereafter, Diaz was charged by a federal grand jury in a six-count indictment with malicious destruction by fire of property used in interstate commerce (arson) in violation of 18 U.S.C. §§ 844(i) and 2 (Count I); mail and wire fraud in violation of 18 U.S.C. §§ 1341, 1343 and 2 (Counts II-IV); and use of fire to commit a federal felony in violation of 18 U.S.C. §§ 844(h)(1) and 2 (Counts V-VI). After a six-day trial, a jury convicted Diaz on the arson charge in Count I and acquitted him on the remaining counts.  The district court sentenced Diaz to five years of imprisonment.

Diaz now appeals his arson conviction, primarily challenging the district court's admission of expert opinion testimony as to the cause of the fire.  That challenge requires us to consider whether  the defendant properly advised the court of the nature of his objection under Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993), to expert testimony presented by the prosecution.  We conclude that he did not.  For that reason and others, we affirm the conviction.

## I.

We describe the facts in the light most favorable to the verdict. See United States v. Van Horn, 277 F.3d 48, 54 (1st Cir. 2002).  Diaz was the owner and operator of Franklin's Prestigio Restaurant, located at 247 Reservoir Avenue in Providence, Rhode Island.  The restaurant occupied part of a building at 241-247 Reservoir Avenue that consisted of several adjacent storefronts.

Diaz leased one of these storefronts and the basement below it from the Camparone family, whose estate owned the building.

The government introduced evidence at trial casting doubt on the financial viability of Diaz's business. For instance, in 1994 and 1995, the restaurant operated at a loss. As of December 31, 1998, its balance sheet reflected assets of only $21,444. Diaz had expressed interest in selling the business and had complained about having few customers.

In the summer of 1998, the Camparone family began efforts to sell 241-247 Reservoir Avenue. Because Diaz had been in the building longer than the other tenants, the Camparones gave him the right of first refusal to buy the building. Diaz explored the possibility of buying the building. He spoke with Jaime Aguayo, a Small Business Administration ("SBA") representative, about arranging financing for the purchase. The SBA advises small businesses on how to obtain bank loans and (if certain conditions are met) guarantees up to 80 percent of the ultimate loan. According to Aguayo's trial testimony, Diaz expressed concern that, if the Camparones sold the building to another tenant, he would be evicted. Despite these initial inquiries, however, Diaz never submitted a completed business plan or copies of his tax returns, a necessary step in the SBA application process.

At some point in October or November of 1998, Diaz had still not succeeded in obtaining financing and Rocco Camparone told him that he would sell the building to someone else. The Camparones then entered into an agreement to sell the building to

one of the other tenants.  A closing was scheduled for February 7, 1999.  The government introduced evidence that Diaz was aware of the pending sale and was upset about it.  However, Diaz denied any such knowledge in his deposition testimony (which was admitted into evidence at trial).   Diaz did not testify at the trial.

In mid-November 1998, Diaz applied for business insurance through Joseph Mazzotta, an insurance agent who had secured other insurance coverage for Diaz.  Prior to that time, Mazzotta was unable to persuade Diaz to purchase business insurance coverage.  Diaz had always said that he could not afford it.  In December 1998, Lloyd's of London issued an insurance policy that provided $100,000 of coverage for the contents of the restaurant and $21,000 of coverage for business interruption.  In late January 1999, about a week and a half before the fire, Diaz phoned Mazzotta several times to confirm that the insurance policy was in effect and visited Mazzotta's office to obtain a copy of the policy.

On Monday, February 1, 1999, just before midnight, a passerby reported to a nearby fire station that the restaurant was on fire.  When the firemen arrived, they found the restaurant locked with no sign of a break-in.  Forcing their way into the building, they discovered that the fire was in the basement.  The fire was ultimately suppressed, though not before causing significant damage to the basement.

According to Diaz's deposition testimony, the restaurant was closed on the day of the fire.  Diaz testified that he had been in the restaurant that day and he had locked it and activated the

burglar alarm before departing. Diaz and his wife were the only ones who possessed keys to the restaurant and only they and their daughter knew the access code for the alarm.

On the night of the fire, Joseph Dorsey, a fire investigator with the Providence Fire Department, arrived to examine the scene and to investigate the cause of the fire. Based on this initial investigation, Dorsey surmised that the fire might have been caused by an electrical malfunction associated with the radio in the basement.

A few days later, on February 5, insurance investigator Thomas Haynes surveyed the scene of the fire at the insurance company's request. His investigation in the basement revealed unusual burn patterns inconsistent with normal fires as well as material on the floor that smelled like paint thinner. Based on his investigation, he concluded that the fire was deliberately set.

On February 10, 1999, both Dorsey and Haynes returned together to the scene to conduct a joint investigation. Dorsey testified that what he observed on this day caused him to reevaluate his initial determination that the fire was accidentally set. According to their testimony at trial, Dorsey and Haynes observed on this day that the burn patterns were consistent with an accelerant being used in the fire. As part of the investigation, a rug sample from underneath a fallen ceiling tile was sent out for lab testing. That sample was found to contain some type of accelerant, such as paint thinner or gasoline. Based upon these

findings, Haynes and Dorsey opined that the fire was set intentionally.

## II.

On March 9, 2001, one business day before trial began, defense counsel filed a two-page "Pretrial Memorandum."[1] That memorandum contained the following sentence: "The only anticipated legal issue potential would be the qualification of the experts, so-called, under the standards of the <u>Daubert</u> trilogy: <u>Daubert</u> v. <u>Merrell Dow Pharm., Inc.</u>, 509 U.S. 579 (1993); <u>General Electric Company, et al.</u> v. <u>Joiner</u>, 522 U.S. 136 (1997), and <u>Kumho Tire</u> v. <u>Carmichael</u>, 526 U.S. 137 (1999)."

At trial, the government called fire investigator Dorsey to the witness stand. Dorsey described his qualifications as an expert in determining the cause and origin of fires. He also discussed some of the methods used in reaching such determinations. Dorsey then proceeded to testify as to the February 1 investigation of the restaurant's basement. He testified that, while firefighters were still busy spraying water in the basement, he surveyed the basement with another investigator who had arrived on the scene earlier. That investigator called Dorsey's attention to a melted-down radio and to burn damage to a nearby bed and a wall containing the wiring going to the outlet into which the radio was plugged. Based on that initial examination, he concluded that the

---

[1] For some reason, the docket sheet does not reflect that filing. However, the parties do not appear to dispute that such a document was filed.

fire might have been caused by an electrical problem associated with the radio in the basement.

Dorsey testified that, after his second examination, conducted jointly with Haynes on February 10, he discovered the evidence that prompted his reevaluation of this conclusion. At this point in the direct examination, the prosecutor asked Dorsey for his present opinion concerning the cause of the fire. Defense counsel's objection on grounds of "foundation" was sustained, apparently because Dorsey had not yet explained what he saw during the second examination that changed his opinion. Dorsey then explained that he detected the odor of something like paint thinner and he observed irregular burn patterns indicative of the use of an accelerant. He also observed that the wall where the radio had been plugged in did not burn through to the other side, causing him to eliminate the radio or some other electrical component as a possible cause of the fire.

The government then asked Dorsey again for his present opinion on the cause of the fire, prompting defense counsel to object on the following grounds:

> Competency to render the opinion. And I didn't have a chance to cross-examine as to the complete elements of the fire scene investigation before I have had the opportunity. He can answer at some later point.

The court overruled the objection, stating: "It goes to the weight and not admissibility and you can cross-examine on that." Dorsey then opined that the fire was "deliberately set." On cross-examination, defense counsel challenged Dorsey's credibility,

-7-

questioning him at length on his qualifications as a cause-and-origin expert, the standards and methods he employed in his analysis, and the factual basis for his opinion on the cause of the fire.

Thomas Haynes, the investigator retained by the insurance company to examine the restaurant premises after the fire, also testified as an expert at trial. After describing his credentials as a cause-and-origin expert, he testified that, on February 5, his investigation in the basement lasted about four hours and revealed unusual burn patterns inconsistent with normal fires as well as material on the floor that smelled like paint thinner. Based on these factors, he concluded that the fire was an "incendiary fire", meaning that it was deliberately set. According to his testimony, he took a sample of the carpet in the basement during this visit and sent it out for testing; that carpet sample ultimately tested positive for the presence of a high-level concentration of mineral spirits.

As to the joint investigation with Dorsey on February 10, Haynes testified that he showed Dorsey the irregular burn patterns in the basement area. Haynes explained how he examined with Dorsey the electrical components in the room, including the copper wiring and the condition of the radio itself. Finding insufficient signs of electrical activity, Haynes ruled out the theory that the fire was electrical.

Based upon the two examinations and his burn pattern analysis, Haynes testified that he had reached a settled opinion as

to the cause and origin of the fire. When the prosecutor asked what that opinion was, defense counsel made the following brief objection: "Objection. Da[u]bert." The court overruled the objection, allowing Haynes to answer. Haynes then testified that he believed that the "origin of the fire was within the office in the basement area, and it was the result of a deliberate, human act of arson."

On cross-examination, defense counsel questioned Haynes at length on his qualifications as an expert, his methodology and the basis for his ultimate opinion. On redirect, Haynes testified without objection that, based upon the burn patterns he observed, his opinion on the cause and origin of the fire would have remained the same even if no evidence of mineral spirits or other accelerant had been found.

At the close of the government's case, Diaz moved for judgment of acquittal under Fed. R. Crim. P. 29. His defense counsel stated that: "I submit to the court that both were qualified by the Court [and] accepted, in terms of their qualifications, by the Court as experts on origin and cause . . . ." He then proceeded to his Rule 29 argument that the testimony of Dorsey and Haynes conflicted in places, and he attacked the experts' investigation into what caused the fire. Based on these deficiencies in the expert witness testimony, he argued that there was insufficient evidence that the fire was deliberately set:

> [T]here is [a discrepancy between the two experts' testimony] and . . . in fact, Mr.

> Dorsey's opinion specifically followed more closely the scientific method, but even that opinion significantly diverged from that which is the appropriate way and the suggested way and the followed way of the scientific method, to such an alarming degree that, in fact, the Court cannot allow the Jury to make a decision on something in which the scientific method was not used when it was able to have been used . . . .

He did not mention <u>Daubert</u> at this time.

The court denied Diaz's motion for acquittal, observing that counsel had "challenged their qualifications, which he's entitled to do, and the court has found that they were both well qualified to express the opinion." The court stated that because both witnesses had testified that the fire was of incendiary origin, "the Jury would be well within its rights to find beyond a reasonable doubt that the fire was of incendiary origin." The court then explained how the evidence was sufficient with respect to other elements of the government's case.

After recalling Haynes for limited testimony as a defense witness,[2] the defense rested. During a chambers conference later that day, defense counsel renewed his Rule 29 motion for judgment of acquittal "for the same reasons that [he had] previously stated." He also stated without elaboration: "In addition, I make a motion under Rule 702 that the opinions of the two experts be excluded under the <u>Daubert</u> analysis as I have previously

---

[2] Defense counsel asked Haynes to identify several photographs that he had taken in the course of his investigation of the fire. These photographs were admitted into evidence in the defendant's case. On cross-examination, Haynes testified that there was nothing in those photographs that was inconsistent with his opinion as to the cause and origin of the fire.

mentioned."  The court denied Diaz's motion to exclude the testimony of the two experts and reserved judgment on the Rule 29 motion.  On March 19, 2001, after the jury had rendered its guilty verdict on the arson charge, the court denied the motion for judgment of acquittal.

On March 29, 2001, ten days after the jury's verdict, defense counsel filed a motion for a new trial.  In that motion, Diaz argued for the first time that the expert testimony of Dorsey and Haynes should be stricken under Fed. R. Evid. 702 not because they were unqualified to testify as experts but because the actual testimony that they gave did not satisfy Rule 702's three numbered criteria.[3]  Diaz specifically argued, inter alia, that the investigation was deficient under those Rule 702 criteria insofar as there was no comparative testing of rug samples and the experts did not follow standard procedures and protocols in their cause-and-origin investigations.  The court denied Diaz's motion.

## III.

Diaz makes three related (albeit procedurally distinct) arguments on appeal.  First, he challenges the admission of expert testimony of Dorsey and Haynes, attacking the validity and reliability of the methodology underlying their testimony.  Second, he challenges the court's denial of his Rule 29 motion for judgment of acquittal.  Third, he claims that the district court erred in denying his Rule 33 motion for a new trial.

---

[3] See infra Section III.A.

-11-

## A. Admission of Expert Testimony

### 1. Gatekeeping Under Daubert

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. As recently amended, it provides that a proposed expert witness must be sufficiently qualified to assist the trier of fact, and that his or her expert testimony must be relevant to the task at hand and rest on a reliable basis:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. See 4 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 702.02[3] (2002). The three numbered criteria were added to Rule 702 in a recent amendment codifying the Supreme Court's decision in Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993) and its progeny, including Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999). See Fed. R. Evid. 702 Advisory Committee Note to 2000 Amendments.

The Supreme Court asserted in Daubert that trial courts perform a gatekeeping role in regulating the admission of expert testimony under Fed. R. Evid. 702. 509 U.S. at 589-95.[4] That

---

[4] In Kumho Tire, the Court made clear that the trial court's "gatekeeper" function applies to all expert testimony. 526 U.S. at 141, 147-49. See Seahorse Marine Supplies, Inc. v. Puerto Rico Sun

-12-

screening function entails a preliminary evaluation of the proffered expert testimony for both reliability and relevance. See Daubert, 509 U.S. at 591-595; Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co., 161 F.3d 77, 80 (1st Cir. 1998) (citing Daubert). The review for reliability encompasses an assessment of "whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Daubert, 509 U.S. at 592-93. As to the relevancy criterion, "expert testimony must be relevant not only in the sense that all evidence must be relevant, but also in the incremental sense that the expert's proposed opinion, if admitted, likely would assist the trier of fact to understand or determine a fact in issue." Ruiz-Troche, 161 F.3d at 81 (citation omitted) (citing Daubert, 509 U.S. at 591-92).

The Rule 702 inquiry is a "flexible one," Daubert, 509 U.S. at 594, and there is no particular procedure that the trial court is required to follow in executing its gatekeeping function under Daubert. In Kumho Tire, the Supreme Court stated:

> The trial court must have the same kind of latitude in deciding how to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability, as it enjoys when it decides whether that expert's relevant testimony is reliable. . . . Otherwise, the trial judge would lack the discretionary authority needed both to avoid unnecessary "reliability" proceedings in

Oil Co., Nos. 01-1791, 01-1792, 2002 WL 1431766 at *10 (1st Cir. Jul. 9, 2002) (noting that a trial court's gatekeeping function "applies to technical and other specialized knowledge in addition to scientific testimony").

-13-

> ordinary cases where the reliability of an expert's methods is properly taken for granted, and to require appropriate proceedings in the less usual or more complex cases where cause for questioning the expert's reliability arises.

526 U.S. at 152. As the Ninth Circuit has determined, "[a]lthough the [Daubert] Court stated that the inquiry is a 'preliminary' one, to be made 'at the outset,' this does not mean that it must be made in a separate, pretrial hearing, outside the presence of the jury." United States v. Alatorre, 222 F.3d 1098, 1102 (9th Cir. 2000) (quoting Daubert, 509 U.S. at 592) (finding voir dire of expert in presence of jury to be permissible under Daubert); see also United States v. Nichols, 169 F.3d 1255, 1262-1264 (10th Cir. 1999) (trial court has discretion not to hold pretrial evidentiary reliability hearing in carrying out its gatekeeping function).

### 2. Availability of Appellate Review for Diaz's Challenge to the Admission of Expert Testimony

Diaz argues that the district court improperly admitted expert testimony by Dorsey and Haynes on the contested issue of causation of the fire. Specifically, he claims that this expert testimony did not satisfy the three numbered criteria in Rule 702. The government, however, maintains that Diaz failed to properly preserve this claim below, thus losing his right to raise that issue on appeal.

As a general rule, we review a trial court's decision to admit or exclude expert testimony under an abuse of discretion standard. See General Electric Co. v. Joiner, 522 U.S. 136, 138-39 (1997). However, Rule 103(a) of the Federal Rules of Evidence

-14-

provides that a claim of error may not be predicated on the admission of evidence unless a timely objection is made -- stating the "specific ground of objection, if the specific ground was not apparent from the context" -- and the admitted evidence affects a substantial right of the party. Fed. R. Evid. 103(a). As we have previously stated, litigants must raise a timely objection to the validity or reliability of expert testimony under Daubert in order to preserve a challenge on appeal to the admissibility of that evidence. See United States v. Gilbert, 181 F.3d 152, 162-63 (1st Cir. 1999) (declining to consider Daubert validity challenge to admitted expert testimony where no objection was made to the trial court on that basis); Cortes-Irizarry v. Corporacion Insular de Seguros, 111 F.3d 184, 189 (1st Cir. 1997) ("[W]e can envision few, if any, cases in which an appellate court would venture to superimpose a Daubert ruling on a cold, poorly developed record when neither the parties nor the nisi prius court has had a meaningful opportunity to mull the question."). However, these statements about the appellate consequences of failing to make a timely objection to the admission of expert testimony are qualified by Fed. R. Evid. 103(d): "Nothing in this rule precludes taking notice of plain errors affecting substantial rights although they were not brought to the attention of the court." The consequence of a party's failure to make a timely objection to the admission of expert testimony is plain error review, not the complete loss of

any right to review.[5]  See Macsenti v. Becker, 237 F.3d 1223, 1230-31 (10th Cir. 2001) (reviewing admission of expert testimony for plain error where objection as to reliability under Daubert not timely made); McKnight v. Johnson Controls, Inc., 36 F.3d 1396, 1407 (8th Cir. 1994) (employing plain error review where objection asserting lack of foundation "fail[ed] to raise any question about the scientific validity of the principles and methodology underlying [witness'] testimony").

### 3.  Diaz's Objection at Trial to the Expert Testimony

At trial, Diaz never raised a specific objection to the reliability of the experts' methodology under Daubert or Rule 702 as a basis for exclusion.  In the two-page "Pretrial Memorandum" filed on the eve of trial, defense counsel made a general reference to the Daubert trilogy in giving notice of a possible challenge to the experts' qualifications: "The only anticipated legal issue potential[ly] would be the qualification of the experts, so-called, under the standards of the Daubert Trilogy . . . ."  By its terms,

---

[5] To support its position that Diaz's failure to make a timely objection precludes any appellate review whatsoever, the government cites Diefenbach v. Sheridan Transportation, 229 F.3d 27 (1st Cir. 2000), and United States v. Bruck, 152 F.3d 40 (1st Cir. 1998). Those cases are clearly distinguishable.  In Diefenbach, the defendant explicitly waived in its appellate reply brief any possible objection to the validity of expert testimony under Daubert, stating that it "has not raised the 'scientific validity[]' objection."  229 F.3d at 30.  Having found such an explicit waiver, we did not have to address any potential Daubert challenge to the validity of the expert testimony.  Id.  In Bruck, we refused to entertain a challenge to the admission of expert testimony where the point was perfunctorily raised and the defendant was not clear in his appellate brief "as to exactly what testimony [he found] objectionable."  152 F.3d at 47.  That is not this case.

-16-

that statement anticipates that any attack on the expert testimony would be limited to the witness's qualifications.

During the direct examination of Dorsey, defense counsel raised an objection, stating: "Competency to render the opinion. And I didn't have a chance to cross-examine as to the complete elements of the fire scene investigation before I have had the opportunity. He can answer at some later point." In objecting to Haynes's testimony, counsel raised a one-word objection: "Objection. Da[u]bert." The court overruled both these objections.

Lumping these pre-trial and trial objections together, Diaz argues that he adequately apprised the court that he was seeking an opportunity to make an inquiry outside the presence of the jury challenging not only the experts' qualifications, but also the validity and reliability of the methodology underlying the experts' testimony. We disagree. Daubert assigns to the district court the function of evaluating the proffered expert testimony pursuant to the requirements of Rule 702. See 509 U.S. at 589-95. Rule 702 encompasses an array of expert witness issues, including the qualifications of the witness, the relevance of the proffered testimony, the adequacy of the facts or data underlying an opinion, the scientific reliability of the witness's methodology, and the reliability of the witness's application of that methodology to the facts. Fed. R. Evid. 702. Diaz's general references at trial to Daubert or competency, particularly in light of a pretrial challenge limited to the qualifications of the experts, was

-17-

woefully deficient for the purpose of advising the district court that Diaz was raising a challenge to the reliability of the experts' methods and the application of those methods under Rule 702.

To the contrary, the court reasonably understood that Diaz's Rule 702 objections were addressed only to the experts' qualifications.[6] Indeed, in denying Diaz's Rule 29 motion for acquittal, the court observed that counsel had "challenged their qualifications, which he's entitled to do, and the court has found that they were both well qualified to express the opinion." During arguments on the Rule 29 motion, defense counsel expressed a similar understanding of his Rule 702 objections: "I submit to the court that both were qualified by the Court [and] accepted, in terms of their qualifications, by the Court as experts on origin and cause . . . ." In renewing his Rule 29 motion at the March 16, 2001, chambers conference, Diaz's counsel stated that his renewed motion was "for the same reasons that [he had] previously stated." He then stated, without elaboration: "In addition, I make a motion under Rule 702 that the opinions of the two experts be excluded under the Daubert analysis as I have previously mentioned." This generic reference to "the Daubert analysis" could reasonably be understood to relate back to his attack on the experts' qualifications. Thus, Diaz's objections at trial failed to adequately preserve his substantive challenge to the reliability of

---

[6] Diaz does not challenge on appeal the experts' qualifications.

the expert witness testimony, leaving him only with plain error review on that claim.

     4.  <u>Plain Error Analysis</u>

To establish plain error in the admission of the experts' testimony, Diaz must demonstrate "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." <u>United States</u> v. <u>Lemmerer</u>, 277 F.3d 579, 591 (1st Cir. 2002) (internal quotation marks omitted). As noted, the criteria of Rule 702 require that (1) an expert's testimony is "based upon sufficient facts or data"; (2) the testimony is the "product of reliable principles and methods"; and (3) the expert apply "the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. Here, both Dorsey and Haynes examined first-hand the basement where the fire took place. These examinations yielded numerous details supporting their theories and refuting alternate explanations for the cause of the fire. Moreover, Dorsey and Haynes explained in detail the methods and principles they employed in determining the cause and origin of fires, emphasizing the significance of various burn patterns. They articulated their bases for eliminating alternative explanations for the fire. We note that other courts have allowed the use of similar cause-and-origin testimony. <u>See</u>, <u>e.g.</u>, <u>Travelers Prop. & Casualty Corp.</u> v. <u>General Electric Co.</u>, 150 F.Supp.2d 360, 366 (D.Conn. 2001) (challenged expert testimony found to be "product of reliable

-19-

principles and methods" where cause-and-origin opinion based upon analysis of burn patterns); <u>Abu-Hashish</u> v. <u>Scottsdale Ins. Co.</u>, 88 F.Supp.2d 906 (N.D.Ill. 2000). <u>Cf.</u> <u>United States</u> v. <u>Ruiz</u>, 105 F.3d 1492, 1497 (1st Cir. 1997) (noting significance of burn-pattern testimony in ruling on sufficiency of evidence to support arson conviction).

Diaz claims that Dorsey and Haynes should have collected additional samples of the basement carpet for testing and arranged for testing of the electrical outlet. Haynes, however, explained that he eliminated the possibility of an electrical fire based upon, <u>inter</u> <u>alia</u>, (1) the condition of the radio and (2) the absence of melted copper wiring (often associated with electrical activity) in the electrical components in the room. Diaz also complains of the experts' failure to investigate the contents of a metal pot apparently found at the scene after suppression of the fire.

We note that Diaz explored these points and others in his cross-examination of the experts. <u>See</u> <u>Daubert</u>, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); Fed. R. Evid. 702 Advisory Committee Note to 2000 Amendments ("[T]he trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system.") (internal quotation marks omitted). Whatever deficiencies there may have been in the work of Dorsey and Haynes (and we do not imply that

-20-

there were any), we are confident that there was no plain error in the admission of their testimony.[7]

## B. Rule 29 Motion for Judgment of Acquittal

At the close of the government's case, defense counsel moved for a judgment of acquittal pursuant to Fed. R. Crim. P. 29. The district court denied that motion, and denied it again upon its renewal at the close of all the evidence. Diaz now appeals that ruling.

We typically review challenges to the denial of a Rule 29 motion for judgment of acquittal under a de novo standard. See, e.g., United States v. Ayala-Ayala, 289 F.3d 16, 21 (1st Cir. 2002). In assessing the sufficiency of the evidence under Rule 29, "we view the evidence and draw reasonable inferences in the light most favorable to the verdict." United States v. McGauley, 279 F.3d 62, 66 (1st Cir. 2002); United States v. Benjamin, 252 F.3d 1, 5 (1st Cir. 2001). The evidence is legally sufficient if, taken as a whole, it warrants a judgment of conviction. Benjamin, 252 F.3d at 5.

---

[7] In a footnote in his brief, Diaz appears to suggest that the expert testimony also violated Fed. R. Evid. 704(b) which prohibits an expert witness from stating an opinion as to whether or not a defendant possessed the requisite mental state relevant to a charged offense or a defense thereto. Diaz cannot prevail on that argument. First, Diaz failed to raise any Rule 704(b) objection at trial. Moreover, Haynes and Dorsey concluded that someone had set the fire deliberately, not that Diaz had done so with malicious intent. Neither expert was ever asked, nor did they offer an opinion, as to whether Diaz set the fire and whether he did so maliciously.

Here, however, Diaz confines his "Rule 29" claim to the limited argument that, if the trial judge had stricken the expert testimony by Dorsey and Haynes on causation, the remaining evidence would have been insufficient to support his conviction and the court would have been compelled to grant his Rule 29 motion. That argument is not a Rule 29 sufficiency challenge. Under Rule 29, we must examine "all the evidence submitted to the jury, regardless of whether it was properly admitted." United States v. Gonzalez-Sanchez, 825 F.2d 572, 588 (1st Cir. 1987). "A trial court in passing on [a Rule 29] motion considers all of the evidence it has admitted, and . . . it must be this same quantum of evidence which is considered by the reviewing court." Lockhart v. Nelson, 488 U.S. 33, 41-42 (1988). Thus, although Diaz styles this ground of appeal as a Rule 29 sufficiency challenge, his argument is tantamount to the claim that admitting the expert testimony of Dorsey and Haynes was prejudicial error -- a claim which we have already rejected. See supra Section III.A. Diaz's appellate brief is devoid of any allegation that all of the evidence admitted -- including the challenged expert testimony -- is insufficient to support his conviction. Thus, we need not engage in such an inquiry.[8]

---

[8] Even if we were to evaluate the sufficiency argument that Diaz fails to make -- namely, that all of the evidence admitted at trial (including the expert testimony) is insufficient to support his conviction, we would reject that argument. The record unmistakably contains sufficient evidence to support Diaz's arson conviction.

## C.  Rule 33 Motion for New Trial

Diaz argues that the district court erred in denying his motion for a new trial under Fed. R. Crim. P. 33.  We typically review a district court's denial of a motion for a new trial under Fed. R. Crim. P. 33 for a "manifest abuse of discretion." United States v. Gonzalez-Gonzalez, 258 F.3d 16, 20 (1st Cir. 2001).  However, under Rule 33, Diaz had to file a motion for a new trial within seven days of the verdict.  Fed. R. Crim. P. 33 (new trial motion based on grounds other than newly discovered evidence must be filed within seven days of verdict).  That rule is jurisdictional. See United States v. Lema, 909 F.2d 561, 565 (1st Cir. 1990).  Here, Diaz, having filed his new trial motion on March 29, 2001, ten days after the jury's verdict, submitted his motion one day late.  See Fed. R. Crim. P. 45(a) (excluding intermediate Saturdays and Sundays from computation).  Thus, the district court had no authority to order a new trial pursuant to Rule 33.  See United States v. Fontanez, 628 F.2d 687, 691 (1st Cir. 1980) ("The district court was clearly correct in finding that the seven-day filing rule [under Rule 33] is jurisdictional and that it had no authority to entertain the motion for a new trial, which was one day late.").

**Affirmed.**